IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| vs. | : | 1:25-CR-3574 |
| | : | |
| **SHELIKY SANCHEZ,** | : | |
| | : | |
| Defendant. | : | Honorable Kea W. Riggs |
| | : | |

## POSITION ON STATUS OF CASE

Sheliky Sanchez, by counsel, hereby provides his position on the status of this case in advance of the Court's November 3, 2025, conference. Mr. Sanchez's position is that given the nascency of his defense, the complexity of the case, the unique demands of capital case representation, and the current federal funding situation, the parties are not able to accurately predict the time needed to prepare this case. Mr. Sanchez asks the Court to set this matter for a status conference in six months, at which time the parties will be better positioned to assess the needs of the case, and to not enter a scheduling order or set case-management deadlines at this time. *See* 7A *Guide to Judiciary Policy* § 670 (providing that the court's initial schedule should address only "resolution of whether the government will seek the death penalty," that even that schedule should only be entered "[w]ithin a reasonable period of time *after* appointment of [learned counsel], and only after consultation with counsel for the government and for the defendant," that the schedule must "allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought," and that the schedule should "be flexible and subject to extension," with "recogni[tion] that scheduling extensions may be necessary" (emphasis added))." This position is based on Mr.

1

Sanchez's rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

In support of this position, Mr. Sanchez states as follows:

1. Mr. Sanchez is eighteen years old. He is the sole defendant charged in this case.

2. On September 9, 2025, the grand jury returned an indictment for one count of carjacking resulting in death, one count of use of a firearm during carjacking resulting in death, and one count of kidnaping resulting in death. *See* Document ("Doc.") 2 at 1–3.

3. The grand jury indictment includes a Notice of Special Findings. *Id.* at 3–4.

4. Special findings are necessary components of a death-eligible indictment. The inclusion of special findings in the indictment means that Mr. Sanchez is under consideration for the death penalty. *See* Justice Manual ("JM") 9-10.090 (noting that if the government has decided "*not* to seek the death penalty before the return of an indictment charging capital-eligible offenses, the indictment need not contain allegations of special findings . . . .") (emphasis added).

5. If convicted of any of the three counts of the indictment, Mr. Sanchez could face the death penalty.

6. The parties agree that this case is complex and should be designated as such pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii).

7. Because he is a capital defendant, Mr. Sanchez is entitled to heightened procedures and specialized resources, including "at least" one attorney who "shall be learned in the law applicable to capital cases . . . ." 18 U.S.C. § 3005.

8. On October 20, 2025, this Court appointed Bernadette Donovan as learned counsel for Mr. Sanchez.

9. Ms. Donovan promptly traveled to New Mexico, where she has spent this week meeting with Mr. Sanchez, working with cocounsel, interviewing and selecting a fact investigator, and performing other initial case tasks. During this time, Mr. Sanchez's counsel also has met with the government to discuss his case.

10. One of the first tasks of learned counsel is to build the core defense team to which a capital defendant is entitled. Consistent with this responsibility, Mr. Sanchez's team is in the process of identifying service providers who have the requisite expertise to work on his behalf.

11. As the Court is aware, a funding crisis has been developing for months in the federal indigent defense system. Criminal Justice Act ("CJA") attorneys such as Ms. Donovan and Mr. Carter Harrison IV have gone months without payment or reimbursement of expenses, which can be particularly sizeable in capital cases. Notably, CJA service providers who are core members of capital defense teams (e.g., fact investigators and mitigation specialists) also have been unpaid for months.

12. Although CJA professionals believed they would be paid and reimbursed on October 1, 2025, the federal government shutdown has further delayed both payment and reimbursement. The shutdown and preexisting budgetary shortfalls are also impacting the operations of the Federal Defender Office. It is presently unknown how long the shutdown will last.

13. The defense is aware that the District Court has stayed proceedings in an authorized capital case. *See* Memorandum Opinion and Order on Defendant's Motion to Stay Proceedings, *United States v. Labar Tsethlikai*, No. 1:24-cr-00539 (D.N.M. Oct. 18, 2025) (Doc. 108). The Court's order staying proceedings in *Tsethlikai* relies upon "the

clear holdings from the Supreme Court, the requirements for mitigation investigation in a capital case, and the Defendant's unequivocal right to the assistance of counsel." *Id.* at 7. In particular, the Court cited the inability of key defense team members and experts to focus on or perform their work due to the funding crisis. *Id.* at 7.

14. Mr. Sanchez's counsel are making good faith efforts to build a core defense team that can begin work on this case in hopes that the funding crisis will be resolved, and thus is not asking to stay proceedings at this time. However, the funding crisis adds uncertainty to a process that is already complex.

15. As discussed below, capital cases have unique requirements. The time needed to fulfill those constitutional requirements depends on case-specific factors that are usually not apparent until investigation has begun.

16. Given the recency of both Mr. Sanchez's indictment and learned counsel's appointment, the defense is unable to provide an accurate prediction of the time that will be required to fulfill its obligations to Mr. Sanchez.

17. Effectively representing a capital defendant at the authorization phase requires months of investigation and preparations. For example, according to a July 2020 declaration by Kevin McNally of the Federal Death Penalty Resource Counsel Project, "[t]he average time between indictment and the defense 'mitigation' presentation at the Department of Justice was 10.9 months." Declaration of Kevin McNally Regarding Preparation Time Before Meeting with the Attorney General's Capital Case Review Committee (July 6, 2020) (attached as **Exhibit 1**).[1]

---

[1] Unsurprisingly, capital case timelines in late 2020 and in the subsequent years were altered dramatically by the COVID-19 pandemic.

4

18. Thus, although undersigned counsel cannot predict exactly how long Mr. Sanchez's preauthorization investigation will take, experience suggests that a timeframe of about eleven months is reasonable.

19. For these reasons, and as discussed further below, Mr. Sanchez asks that this Court set this case for a status conference in six months. At that time, the parties will be better positioned to set an informed, specific schedule for this case.

## ARGUMENT

Mr. Sanchez is a young adult facing the most serious penalty: death. His case has just begun, and his learned counsel was appointed less than two weeks ago. At this stage of a capital case, it is impossible for counsel to accurately project the time that it will take to effectively represent Mr. Sanchez. That would be true this early in any capital case but is particularly true given the federal funding crisis. To provide the defense team with time to assess the case and its requirements, Mr. Sanchez asks this Court to set his case for a status conference in six months. At that time, Mr. Sanchez's defense team will have an informed perspective on the specific timeframe necessary to effectively represent him in this case. When considering this request, Mr. Sanchez asks the Court to consider the foundational law applicable to death penalty cases, the rigorous standards of capital defense that have emerged from that law, and the Court's role in ensuring that a capital defendant has a reasonable opportunity to present his case during the authorization process.

1. **The Law that Guides Capital Defense Preparations.**

Of course, all defendants are entitled to the effective assistance of counsel, regardless of whether they can pay for their defense. *See* U.S. CONST., amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984); *Gideon v. Wainwright*, 372 U.S. 335 (1963). But even before the right to

appointed counsel was acknowledged generally, the United States Supreme Court recognized that defendants *facing the death penalty* needed the assistance of counsel. *See Powell v. Alabama*, 287 U.S. 45 (1932).  Because the death penalty is a uniquely serious and irrevocable punishment, defending a capital case requires specialized knowledge of the law and professional norms applicable to death penalty cases.  For that reason, federal detainees facing death-eligible charges are entitled to the appointment of counsel learned in the law applicable to capital cases. *See* 18 U.S.C. § 3005.

The standards of capital defense are complex and demanding.  But at bottom, they are designed to eliminate arbitrariness in the death penalty while also ensuring individualized sentencing determinations.  In 1972, the United States Supreme Court held that although the death penalty was not *per se* unconstitutional, it was unconstitutional as then administered. *Furman v. Georgia*, 408 U.S. 238 (1972).  The justices' primary concern was that due to sentencers' unfettered discretion, the death penalty was imposed in a random and arbitrary manner.  Over the next few years, the states attempted to design new death penalty systems that would meet constitutional standards.  In 1976, a number of these systems reached the United States Supreme Court, which gave guidance as to the features of constitutional death penalty systems.

In two of the 1976 cases, the Supreme Court held that mandatory death sentences violate the Eighth Amendment. *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Roberts v. Louisiana*, 428 U.S. 325 (1976).  In part, the Court rejected mandatory death sentences because they "fail[] to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson*, 428 U.S. at 303.  The Court observed that mandatory death penalties "exclude[] from consideration in

fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Id.* Simply put, mandatory death sentencing is unconstitutional because it "treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Id.*

At the same time, the Court approved of state systems that were designed to guide juror discretion while also providing for individualized consideration of mitigation. *See Gregg v. Georgia*, 428 U.S. 153, 197 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976). Although these schemes had important differences, all of them required both findings of aggravating factors (meant to eliminate arbitrariness through narrowing the class of death-eligible defendants) and consideration of a defendant's individual, personal mitigating circumstances.

Since then, the Supreme Court has affirmed the constitutional importance of allowing a capital defendant to investigate and present *all* mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the capital sentencer must be permitted to consider "*as a mitigating factor*, any aspect of a defendant's character of record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (holding that the capital sentencer may not refuse to consider a defendant's mitigation). The constitutional importance of aggravation and mitigation is unique to the death penalty context. *See Lockett*, 438 U.S. at 604 (noting that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.").

Since *Gregg* and its companion cases, the United States Supreme Court has issued numerous death penalty decisions. Many of these cases have arisen after a death sentence is imposed, when habeas courts are called upon to assess the constitutional effectiveness of capital counsel. Time and time again, the Court has recognized that capital trial counsel are constitutionally ineffective if they fail to investigate and present mitigating evidence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 535–37 (2003) (holding trial counsel ineffective for failing to investigate and present mitigating evidence including history of physical and sexual abuse, alcoholic parents, and foster homes); *Rompilla v. Beard*, 545 U.S. 374 (2005) (finding trial counsel ineffective for failing to investigate aggravating evidence of prior conviction that also would have revealed mitigation leads); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam) (holding trial counsel ineffective for failing to obtain records and conduct interviews necessary to find mitigating evidence); *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam) (concluding that fact trial counsel presented "*some* mitigating evidence" did not mean defendant was not prejudiced by failure to investigate and present other mitigation); *Andrus v. Texas*, 590 U.S. ___, 140 S. Ct. 1875 (2020) (per curiam) (holding trial counsel ineffective for failing to uncover mitigating evidence and to adequately investigate aggravating evidence). As a result, one of the surest ways to set a death penalty case on a course for ultimate reversal is for capital defense teams to have insufficient time to prepare.

2. **<u>Professional Norms of Capital Defense.</u>**

Over the last forty-nine years, a vast body of constitutional law and professional norms has developed to guide capital defense teams in how to investigate aggravation, mitigation, and the guilt/innocence phase. When considering their special constitutional obligations, capital defense teams look to professional standards such as the *American Bar Association Guidelines*

*for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (Rev. ed. 2003) ("ABA Guidelines") and *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ("Supplementary Guidelines").  The reason these standards carry significant weight is because the United States Supreme Court "long ha[s] referred" to them "as 'guides to determining what is reasonable.'"  *Wiggins*, 539 U.S. at 524 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  These ABA Guidelines are thus well-established sources of the standards of representation to which a capital defendant is entitled.

One of the first duties of capital counsel is to build the "core defense team."  The ABA Guidelines specifically require capital defense teams to have "no fewer than two attorneys qualified in accordance with Guideline 5.1, *an investigator, and a mitigation specialist*."  ABA Guidelines, Guideline 4.1 (emphasis added).  The Commentary to Guideline 4.1 refers to these "four individuals constituting the *smallest* allowable team" as the "Core Defense Team" in a capital case.  The Commentary to this Guideline also notes that "quality representation cannot be rendered unless assigned counsel have access to adequate" support staff, including investigators.  *Id.* at Commentary to Guideline 4.1.  Thus, capital counsel cannot provide effective assistance of counsel by themselves: they need other qualified team members to perform specialized work on the accused's behalf.

The investigations conducted by both the fact investigator and mitigation specialist are also governed by the minimum standards of the ABA Guidelines.  Guideline 10.7 provides that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."  Fact investigation must include detailed interviews of potential witnesses, access to the prosecution's evidence, and ensuring that counsel

9

"view the scene of the alleged offense as soon as possible." ABA Guidelines, Guideline 10.7, Commentary.

For these reasons, a high-quality fact investigator is a necessary member of the capital defense team. As the Commentary to this Guideline provides:

> The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings. Although some investigative tasks, such as assessing the credibility of key trial witnesses, appropriately lie within the domain of counsel, the prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation. Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case. Moreover, the defense may need to call the person who conducted the interview as a trial witness. As a result, an investigator should be part of the defense team at every stage of a capital proceeding.

*Id.* Moreover, homicide cases are particularly complex and require more investigation than other criminal cases. There is also an issue of fundamental fairness, as "[t]he prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own." *Id.*

"A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have." ABA Guidelines, Commentary to Guideline 4.1. In addition to gathering records and interviewing witnesses, mitigation specialists have critical interactions with capital defendants. "They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed." *Id.*; *see also id.* ("The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case

10

is pending."). A mitigation specialist's duties also include "compil[ing] a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation," analyzing the information, developing themes, and assisting with experts.

The requirements of mitigation investigation are demanding:

Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." At least in the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for

expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

1. discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

2. explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors; and

3. obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer. As noted *supra* in the text accompanying note 103, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others. Records—from courts, government agencies, the military, employers, etc.—can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

> Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:
>
> a. school records
> b. social service and welfare records
> c. juvenile dependency or family court records
> d. medical records
> e. military records
> f. employment records
> g. criminal and correctional records
> h. family birth, marriage, and death records
> i. alcohol and drug abuse assessment or treatment records
> j. INS records
>
> If the client was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's contemporaneous and later conduct. The investigation should also explore the adequacy of institutional responses to childhood trauma, mental illness, or disability to determine whether the client's problems were ever accurately identified or properly addressed. Even if the institution that responded to the client was not grossly abusive or neglectful, it may have been incompetent in a number of ways. For example, IQ testing or other psychological evaluations may have been performed by untrained personnel or using inappropriate instruments—flaws that might not appear on the face of the institutional records.
>
> The circumstances of a particular case will often require specialized research and expert consultation.

ABA Guidelines, Guideline 10.7, Commentary (emphasis added).

In addition to these 2003 Guidelines, the 2008 Supplementary Guidelines provide even more specificity about the requirements of mitigation investigation. The Supplementary Guidelines "apply from the moment that counsel is appointed and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings," etc. Supplementary Guidelines, Guideline 1.1(B). Like the original Guidelines, the Supplementary Guidelines require "an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any

circumstances of the offense, or other factors, which may provide a basis for a sentence less than death." Supplementary Guidelines, Guideline 10.11(B).

Notably, the Supplementary Guidelines dictate that the defense team "must conduct in-person, *face-to-face, one-on-one interviews* with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death." Supplementary Guidelines, Guideline 10.11(C) (emphasis added). At the risk of stating the obvious, a single interview is usually not sufficient to uncover embarrassing or secret mitigating information, such as sexual abuse, family history of mental illness, and family history of addiction. Rather, "[m]ultiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation." *Id.*

Of course, the ABA Guidelines are now twenty-two years old: four years older than the young man whose life is at stake in this case. The standard of practice has advanced in many ways, and capital defense practitioners are professionally and ethically obligated to stay abreast of those developments. But the Guidelines offer a sense of the well-established, long-standing norms of capital defense representation. Because they have been cited by the United States Supreme Court with approval, it is also well accepted that they represent *minimal* standards for death penalty representation. They are thus informative when considering the work that Mr. Sanchez's defense team must do to effectively represent him.

As is likely clear from the above summary, a constitutionally effective investigation cannot be done quickly. Even under ideal circumstances, counsel must select an appropriate mitigation specialist, who then must build rapport with the client and his loved ones, collect records, and interview witnesses. This process is necessarily cyclical, as initial investigation

14

inevitably reveals the names of more witnesses who must be interviewed and records that must be collected. But in this case, identifying and hiring qualified personnel is harder given the funding crisis, and it is currently difficult to predict how long the lack of payment and reimbursement will last. Under these circumstances, it is particularly challenging to predict the time that will be necessary to meet the demanding standards of capital representation.

    **3. It is Critical to Invest Time in the Authorization Phase.**

If the defense does not have sufficient time to investigate an accused's mitigation, there is a risk that the government will authorize the death penalty for someone who is ultimately—once their case is fully investigated—almost certain not to receive such a penalty. An authorized death penalty case is an enormous strain on resources, in part because of the heightened standards to which the defendant is entitled. In contrast, when the defense has a true opportunity to investigate and present mitigation during the authorization phase, unwarranted authorization can be avoided. *See* Hon. Helen G. Berrigan, *The Indispensable Role of the Mitigation Specialist in a Capital Case: A View From the Federal Bench*, 36 HOFSTRA L. REV. 819 (2008) (discussing how mitigation is not only constitutionally necessary, but also cost effective and critical to reducing the risk of error in a capital case).

As mentioned above, an effective defense authorization investigation depends on a variety of factors, including the alleged offense, characteristics of the accused, and the risk of authorization. "The demands of each case—and each stage of the same case—will differ. Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality representation under the particular circumstances at hand . . . ." ABA Guideline 4.1, Commentary. What is always clear, however, is that investing time in this initial phase of a

15

federal capital case decreases the likelihood of a death penalty authorization that is based on an uninformed assessment of the accused and his mitigation.

In the federal system, "except as otherwise provided herein . . . the Attorney General will make the final decision to seek the death penalty." Department of Justice, Justice Manual 9-10.050, available at https://www.justice.gov/jm/jm-9-10000-capital-crimes#9-10.010 (last visited Oct. 30, 2025). This is true "regardless of whether the United States Attorney . . . intends to charge the offense subject to the death penalty or to request authorization to seek the death penalty for such an offense." Justice Manual 9-10.010. Unlike state systems, the federal system centralizes death penalty decisions. This is meant to promote the "consistent and even-handed national application of Federal capital sentencing laws," as well as "allow proper individualized consideration of the appropriate factors relevant to each case." Justice Manual 9-10.030. The Justice Manual specifies a "multi-tier process" that "is carefully designed to provide reviewers with access to the national decision-making context, and thereby, to reduce disparities across districts." *Id.*

In some cases, the United States Attorney recommends a "no-seek" determination without input from the defense. *See* Justice Manual 9-10.070. If the United States Attorney submits a case for expedited no seek, that fact is not confidential, and the government can advise both the Court and the defendant that his case has been submitted for an expedited no-seek determination. *See id.* In cases where the United States Attorney is contemplating seeking the death penalty, however, the United States must "give counsel for the defendant a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty." *Id.* at 9-10.080. In this case, it is undersigned counsel's understanding that Mr. Sanchez's case

16

has *not* been submitted for an expedited no seek, and thus Mr. Sanchez must have a reasonable opportunity to present information to the government.

Of course, a defendant's mitigation—and thus effective mitigation investigation—is critical to the Department of Justice's determination. But fact investigation is also important. The Justice Manual makes clear that the Attorney General "may consider any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty." *Id.* at 9-10.140. This specifically includes "[t]he strength and nature of the evidence." In other words, an effective presentation by the defense includes not only mitigation, but also critical assessment of the prosecution's cases for both guilt and aggravation. Consequently, Mr. Sanchez must have a reasonable amount of time to conduct both areas of investigation.

The Justice Manual does not define "a reasonable opportunity to present information," but some guidance is provided by the Guide to Judiciary Policies and Procedures, Chapter VII, § 670. In relevant part, § 670(a) does advise the Court to "establish a schedule for resolution of whether the government will seek the death penalty," but also advises that the Court set such a schedule "[w]ithin a reasonable period of time *after* appointment of [learned counsel], and only after consultation with counsel for the government and for the defendant . . . ." (emphasis added). Such a schedule should include a deadline for "the submission by the defendant to the U.S. attorney of any reasons why the government should not seek the death penalty." § 670(b)(1). However, section 670(d) makes clear that the "schedule should allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought . . . ." Additionally, § 670(c) advises that "[t]he schedule should be flexible and subject to extension at the request of either party . . . ."

In this case, Mr. Sanchez's learned counsel was appointed less than two weeks ago. Although Mr. Sanchez's counsel are working quickly to build the core defense team required by capital standards of representation, Mr. Sanchez does not yet have a mitigation specialist. Identifying an appropriate mitigation specialist who is willing and able to work on this case during a federal funding crisis is no small task. Moreover, counsel need the input of a mitigation specialist to determine what tasks are necessary to an effective authorization presentation, and thus what amount of time will be necessary to prepare a submission for the United States. Consequently, the defense has not had a reasonable period of time *after* the appointment of learned counsel to assess the case and provide an informed view of a capital case schedule, as contemplated by § 670. Moreover, given the current uncertainty surrounding federal funding, it is impossible for undersigned counsel to predict the impact of nonpayment on the defense. Under these circumstances, Mr. Sanchez asks the Court to schedule a status conference in six months, at which point the defense will be positioned to provide an informed assessment of the case and the remaining time necessary for preauthorization investigation.

Respectfully submitted,
SHELIKY SANCHEZ

s/ Bernadette Donovan

Bernadette M. Donovan
VA BAR 82054
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Office 800-428-5214
Fax 434-465-6866
bernadette@donovanengle.com

Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Office: 505-295-3261

Fax: 505-341-9340
carter@harrisonhartlaw.com

Noah W. Gelb
Assistant Federal Public Defender
Office of the Federal Public Defender

111 Lomas Blvd., NW, Suite 501
Albuquerque, NM 87102
Office: 505-346-2489
Noah_gelb@fd.org

***Counsel for Sheliky Sanchez***